[L. A. No. 15441.   In Bank.—June 17, 1936.]

GEORGE W. PADGHAM, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Shattuck, Davis & Story for Petitioner.

Philbrick McCoy for Respondent.

THOMPSON, J.—This proceeding is one to review the recommendation of the Board of Governors of The State Bar that the petitioner be disbarred. Three complaints were lodged against him by four of his former clients and three notices were directed to petitioner requiring him to show cause before the local administrative committee why he should

not be disciplined for professional misconduct. The first complaint contained two counts and the others one each. We shall set forth separately the facts necessary to an understanding of each count of the complaints.

■ The committee found, responsive to the averments of the first count of the first notice, substantially as follows: On February 18, 1929, Frank Bryan of Pasadena died intestate, leaving surviving him three children, one son and two daughters. At the time of his death Bryan held insurance in the fraternal organization known as the Ancient Order of United Workmen, commonly referred to as the A. O. U. W., in the sum of $2,000, but subject to a loan of $440 and also subject to a delinquency for the nonpayment of dues for the months of December, 1928, and January and February, 1929, in the total sum of $33.78. The petitioner had represented Frank Bryan in his lifetime and was familiar with his affairs. The children were not residents of this state. The petitioner immediately notified the son, Harry Bryan, who came from Chicago to attend the funeral. While in Pasadena Harry Bryan employed petitioner to collect the insurance mentioned, explaining to him that he did not know the whereabouts of his sister, Ethel Bryan (Barton), but that he believed he could procure a power of attorney from his other sister, Fredricka Ernestine Bryan (Biles). Harry Bryan knew nothing about the policy except as informed by petitioner between about February 27th and about March 2d, at which later date he returned to Chicago. On February 19th petitioner wired the home office of A. O. U. W. at Newton, Kansas, advising it of Bryan's death and asking if the latter was in good standing and for the name of the beneficiary and asking for proof blanks. On the day following the lodge telegraphed petitioner names of the three beneficiaries and said "letter follows". The letter which the grand recorder testified he sent on February 21st advised petitioner of the status of the policy, the amount of the loan, the amount necessary to reinstate the policy by payment of the delinquent dues and contained forms for proof of death. However, petitioner did not inform Bryan of these facts, but rather told him of the loan against the policy, that the policy had lapsed for nonpayment of dues, but that he had formerly been connected with the A. O. U. W. in the field, that he was a member thereof, and that though there might be serious complications,

he thought perhaps he might be able to effect a recovery. On this basis petitioner made a contract with Harry Bryan to handle the matter on a fifty per cent contingent basis.

Subsequently petitioner forwarded $33.78 for dues to the lodge and thereafter sent forward proof of death. On May 6th checks to each of the three beneficiaries were mailed in the sums of $518.67, which petitioner cashed by signing the names of the payees by himself as attorney. At the time he had powers of attorney from Harry Bryan and Fredricka E. Bryan (Biles), but no authority of any kind from Mrs. Ethel Bryan (Barton).

It is further found in effect as follows: From petitioner's testimony it appears that Harry Bryan had requested him to endeavor to get each of the other two beneficiaries to allow him (Bryan) one third of his expense in connection with his trip and the funeral. Petitioner failed to make any accounting for the money so collected, advancing as an excuse for such failure, that he had not been able to get the two sisters to agree to contribute their proportionate share of such expenses and further that he was not able to locate Mrs. Ethel Bryan Barton. However, she was located in the early part of 1932 and the letters written by petitioner to her, particularly those of February 22, 1932, and March 29, 1932, are found to have been written for the sole purpose of beclouding the issue and of delaying the necessity for making an accounting. Finally, three actions were commenced by the three beneficiaries on November 7, 1932, and, on January 7, 1933, after petitioner had interposed demurrers and pleas of the statute of limitations, judgments were recovered. After being cited on supplemental proceedings, during which counsel was unable to discover from the testimony of petitioner any property on which to levy, and in May, 1933, approximately four years after the money was collected, petitioner settled with his former clients by paying the sum of $1250.

We are not inclined to set forth any more of the evidence than is recited in the statement of the effect of the findings. We have carefully read the transcript and it is manifest therefrom that the committee fairly arrived at its conclusions. In fact, as we read the testimony, the conclusions could not well have been other than they were. The committee might, however, have called attention to the fact that the money was first of all deposited in petitioner's general account in a bank

in Pasadena; that, shortly thereafter, $750 from that account was deposited in a bank in Los Angeles in petitioner's name, but not as a trustee, for a period of about two weeks, which petitioner says he had intended to treat as a trust account, and that, after two weeks, this sum of $750 was kept in cash either at his office or at his home along with other trust funds. Furthermore, Harry Bryan testified positively that he did not agree to pay fifty per cent of his proceeds for the collection of the insurance. This latter fact is recited to indicate that petitioner's version of the facts has been adopted. Petitioner questions the sufficiency of the facts to establish the findings but his claim in this particular must be denied. His other assertion applies to the other charges and will be considered when they have all been set forth.

We turn, therefore, to the second count in the first notice to show cause. With respect to this count the local administrative committee concluded that petitioner had acted in bad faith in withholding a part of a sum of money collected for his client, S. E. Bevis, and in failing or refusing to properly account therefor. We are in accord with that conclusion. Without setting forth all of the testimony, it appears from the transcript that Bevis placed with petitioner, for immediate suit thereon, a promissory note in the principal sum of $800, executed by one J. E. Bridges and others and gave petitioner $35 to pay filing fees and not to exceed $10 on an attachment bond. The petitioner agreed to collect the note with accrued interest on the basis of the ten per cent attorney's fee provided for in the note. On the day following, Bevis took the complaint and other papers to Riverside for filing and instructed the sheriff to levy attachment. While the petitioner paid the filing fee of $7, Bevis was compelled to pay $35 to the sheriff for his fee. Prior to December 2, 1932, and apparently about November 19th or 20th, petitioner received from the defendants in the action $964.09, made up of the following items: Principal, $800; interest to November 19, $30.49; filing fee, $7; cost of attachment bond, $20; sheriff's costs, $23.60 and attorney's fees, $83. In addition, some time between December 2, 1932 and January 5, 1933, petitioner received an additional $56.25 for interest on the sum of $800 prior to the execution of the note which evidenced the loan. On December 2d, petitioner mailed Bevis a check for $500, although it is apparent that he held, after

allowing him credit for the filing fee and bond, about $900. On January 5, 1933, after collecting the additional $56.25, for which a charge of $15 was made, petitioner tendered Bevis a check in the sum of $326.45, as payment in full of the account. His misleading and erroneous manner of accounting is best exemplified in the statement rendered:

"The Bridges matter is worked out as follows:

Principal of note.......................$800.00
Interest ............................. 32.15
  Difference due you as follows:
$35.00 check advanced by you to sheriff
 24.35 sheriff's costs deducted

$10.65 Balance as a credit.............. 10.65
  Difference due you as follows:
$35.00 cash advanced by you
 17.00 filing fee and attachment bond

$18.00 Balance as a credit.............. 18.00    $860.80
Less phone calls and personal ser-
    vices at Riverside............... $19.35
Less account owing office......... 15.00             34.35

                                   Total   $826.45
Less payment advanced......................   500.00

              Balance check enclosed       $326.45

Back interest collected........... $56.25
Collection fee and charges...... 15.00

              Balance due ...... $41.25"

It is to be noted that the $15 charge under the heading "account owing office" was correct as was also the collection charge of $15. After crediting him with these items as well as those already mentioned, it is obvious that he owed Bevis approximately $100 additional. Without unduly prolonging the facts, it is sufficient to say that Bevis refused the check and demanded an itemized account. Petitioner declined to render any such account until Bevis placed the matter in the hands of attorneys. Finally, on March 14, 1933, action was filed and judgment recovered April 10, 1933, for the principal

sum of $418.40. Petitioner at the hearing of the charge attempted to justify his retention of approximately $100 by claiming that he was handling another matter for Bevis and was told by the latter to retain the money. This assertion the record conclusively shows to be without foundation. Bevis disputed this contention and the petitioner's own exhibits disclose that the other matter was concluded before the Bridges .note was placed with him. Further, the purported account makes no such claim. Further, Padgham mailed Bevis a statement on November 15th covering a charge for this other case and included it in his statement of January 5, 1933. Lastly, he filed no counterclaim for such a sum, but in his answer admitted owing $396.50. Enough has been said to indicate that the evidence fairly warrants the committee's conclusion. No other claim is advanced by petitioner with respect to this count.

We may now consider the second notice to show cause involving a charge dealing with petitioner's financial transactions but of a somewhat different character. Petitioner, in the year 1931, was the attorney for a Miss Warrington, as executrix of the estate of May B. Hardman, deceased. In addition to being a devisee under the will of Mrs. Hardman, Miss Warrington was the beneficiary in an accident policy in the sum of $5,000, which sum she received some time prior to July, 1931. Of this sum Miss Warrington used $3,000 to repay to Miss Mildred Vollmer moneys borrowed from her. They were intimate friends and when Miss Vollmer put the $3,000 on deposit in her account she arranged so that Miss Warrington might draw checks in case anything happened to her (Miss Vollmer). The estate had been involved in litigation with the surviving husband and, during the latter part of July, 1931, petitioner suggested to both women that inasmuch as Mr. Hardman was trying to claim the insurance money it should be hidden and asked how Miss Vollmer would like to loan him the $3,000 on his own home on a first trust deed with interest at eight per cent. Both women testified he assured them the property was clear. Petitioner denies that he made the statement but, in view of other portions of his testimony, which are obviously incorrect, and of the further fact that when testifying to the purported conversations he never gave the substance other than to say he advised them of the exact status of the title, it must be determined, in ac-

cordance with the committée's conclusion, that he did so represent the title of the property. Instead of being free from encumbrance, however, it had been sold on foreclosure for $5,392.54. The $3,000 was used to make the first payment on the redemption. Subsequently and some time in October, 1931, the remainder of the redemption money was paid. Another deed of trust securing a note of $2,150 appeared of record but had apparently been satisfied. It was satisfied of record by petitioner in 1933. In addition the property had been sold to the state for county taxes of 1930, which with subsequent delinquencies and penalties amounted to $228.19, and sold to the city of Pasadena, the total to redeem from which last sale amounted to $194.32. The petitioner claimed that these taxes had been paid, but offered no proof outside of his statement to that effect. The property stood of record subject to the encumbrances in the name of the petitioner's wife. The trust deed was executed shortly after Miss Vollmer gave petitioner the $3,000, but it was not recorded, nor was an escrow had nor title brought down. Both Miss Warrington and Miss Vollmer testified that Miss Vollmer demanded the trust deed many times but without success but petitioner claims he delivered it to Miss Vollmer who asked him to put it in a tin box belonging to Miss Warrington in his safe. Also both women told of numerous requests for interest but that none was paid. In this connection, petitioner first asserted that he had never been employed by Miss Vollmer as her attorney, hoping, as is shown by objections in the record, that such a position would remove the transactions from the realm of professional conduct. Subsequently, when it came to the question of interest, he attempted to assert that Miss Vollmer had employed him in conjunction with Miss Warrington and that the interest had been paid by the rendition of service. He failed, however, to set forth by statement or otherwise any specific work performed for her, or any claim other than in his testimony that would indicate such a state of affairs. It seems clear to us from a reading of the cold record that no such services were in fact rendered.

From our recital of the salient facts relating to this charge, it is manifest that petitioner took an unfair advantage by misrepresenting the condition of the title of the property.

Hence we must conclude as did the committee and the Board of Bar Governors.

Turning to the third notice to show cause we find involved a number of transactions, although set forth in one count. And while we have heretofore discovered that petitioner had an unusual and unprofessional method of and inclination toward holding onto the funds of his clients, the testimony on this branch of the case reveals an amazing proclivity for juggling the property of his clients and involving them in the snarls resulting therefrom. Mrs. Grace M. Wright was the client in all the transactions involved in the third notice to show cause and we shall first discuss, as briefly as possible, what has been termed the Banning Ranch. Before employing petitioner, which was some time in February, 1930, Mrs. Wright had foreclosed and purchased the ranch at foreclosure for the sum of $15,272 and had received the commissioner's certificate of sale. Theretofore she had entered into an agreement with one L. H. Lucas to sell him the property in the event that she became the purchaser. Petitioner advised Mrs. Wright, after being retained by her, that she should take action to terminate or rescind the contract with Lucas, and in order to make it easier for him to defeat any claim Lucas should assert that she should assign her certificate of sale to Frances Warrington, a client of his, who has heretofore been mentioned in this proceeding, and incidentally an intimate friend of Mrs. Wright. The assignment was made and, in November, 1930, the commissioner issued his deed to Miss Warrington. Shortly thereafter, and by advising Miss Warrington that she might be involved in litigation arising out of the Hardman estate, the petitioner secured from Miss Warrington a deed to the ranch with the name of the grantee left blank, in which space the petitioner later inserted his own name. While it appears that Mrs. Wright knew that title would not be vested in her or Miss Warrington, it does not appear that she knew or consented to its transfer to petitioner. After this deed was recorded petitioner continued his efforts to settle with Lucas and on July 7, 1931, secured from him a cancellation of the agreement. In the meantime he insisted that Mrs. Wright deny any claim or interest in the property. Subsequent to July, 1931, and instead of reconveying the property to Mrs. Wright, petitioner of his own volition and without the permission of

his client executed a note secured by a trust deed on the property to James Yoakam, another client, for the principal sum of $20,000. This transaction was purely fictitious and petitioner at the time took from Yoakam a reconveyance so that he might clear the record at any time. Petitioner says this encumbrance was apparently placed against the property not only for the purpose of keeping the title out of the names of Mrs. Wright and Miss Warrington but also for trading purposes. Be that as it may, it is sufficient to say, although the Lucas contract was terminated July 7, 1931, petitioner continued to hold the property until December 21, 1932, at which time the first or preliminary settlement was effected between him and Mrs. Wright, in which petitioner required Mrs. Wright to give him a note secured by a trust deed for the sum of $4,058.06, representing what he claimed to be his interest in the property or one-half of its value in excess of $15,272, and the unpaid balance of his fees and costs advanced in the sum of $558.06. This trust deed was subsequently released in connection with the Harkness Avenue property, and in the final settlement.

In the order of the testimony, the next transaction has to do with the Beaumont property. During 1929 Mrs. Wright exchanged this property for a residence in Pasadena, and as a part of the transaction, took back a mortgage for $375, executed by one Bert Wilson and his wife. Subsequently, Lucas, who had acted as agent for Mrs. Wright, took title in the name of his two children to the Beaumont property subject to the mortgage. The property, either in the hands of Wilson or Lucas, became subject to a mechanic's lien filed by the Hayward Lumber Company in the sum of $175. In June, 1929, Mrs. Wright assigned the note and mortgage to a Mrs. Orbison. Some time in 1930 a settlement with respect to this property was effected between Mrs. Wright and Lucas and the latter caused to be executed a deed conveying it to Mrs. Wright. Prior to May 7, 1931, petitioner advised Mrs. Wright that, in order to preclude the lumber company from collecting its lien and certain other persons whom petitioner testified claimed some interests from asserting their claims, she should have the note and mortgage taken over by a third party and foreclosed. On that day Mrs. Wright delivered to him a check for $400 for the purpose of buying the mortgage. Instead of immediately purchasing the mortgage petitioner

cashed the check and paid Mrs. Orbison as follows: May 10th, $50; May 14th, $150; August 29th, $100; January 12, 1932, $100, and January 15, 1932, $33.65, all of which were endorsed as payments, although he did procure an assignment to James Yoakam.

He then took the deed which Lucas had given Mrs. Wright, erased her name as grantee thereon and inserted in its place the name of one George F. Cook. He recorded the altered deed and then began an action on behalf of Yoakam against Cook for the purpose of foreclosing the mortgage. A reference to the bill subsequently rendered by petitioner discloses that it cost Mrs. Wright, in addition to the $400 advanced to purchase the mortgage, in excess of $400, including the petitioner's fee of $250, to follow the course we have outlined, instead of settling the mechanic's lien as would have been the usual procedure. However, inasmuch as we have mentioned fees, it ought to be noted at this juncture that petitioner is not accused of charging such exorbitant fees as to warrant disciplinary action.

In November, 1931, without the knowledge or consent of Mrs. Wright and without any account therefor, petitioner rented the Beaumont property to one Ben Richards for ten dollars a month. Richards testified that he mailed petitioner $120 in cash and made improvements aggregating the same amount. Petitioner denies receipt of any money, but his own letter evidences the rental. Furthermore, Richards was evidently an unprejudiced and unbiased witness.

The next transaction and the last one we shall discuss involves the Harkness Avenue property. Some time in 1930 Mrs. Wright advised petitioner she had $2,000 to invest. He advised her he had a client who wished to borrow $3,500 and would secure the same by a first trust deed on property on Harkness Avenue, Pasadena; that his client desired to borrow the money for use in improving the building and would not need the entire amount immediately; that he knew the property was free from encumbrance and that it would not be necessary to have the title searched. Mrs. Wright investigated the property and was satisfied with the security offered. She gave petitioner a check for $2,000 made payable to James Yoakam (the same person heretofore mentioned) and dated April 22, 1930, and made arrangements at a bank to borrow the additional $1500 and to pledge as collateral the note and

trust deed that she expected to receive from Yoakam. It developed that the property shown was property which had belonged to Mrs. Bryan, the wife of Frank Bryan, whose insurance was involved in another count of this proceeding, and who had predeceased her husband. It appears that the property had been deeded to Grace Padgham, petitioner's wife, and petitioner testified there was an oral understanding that she was to hold it in trust for Mrs. Bryan's son, Everett Allen. He further testified that he, petitioner, had arranged to sell it to Yoakam and that it was to be improved, but by reason of being unable to have it zoned for some particular purpose, the deal was not consummated. On April 26th, Mrs. Wright drew her check to Yoakam for $1500. She says petitioner never advised her that there was any question about the deal but he says he told her the situation. The fact remains that she never received a deed of trust. She renewed her note at the bank on July 25, 1930, and, on November 6, 1930, was obliged to borrow the money from Miss Warrington for the purpose of paying the bank because the bank would no longer carry it without the trust deed as security. She agreed that Miss Warrington should have the Yoakam trust deed and mortgage as security for the loan. About this time petitioner transmitted to the bank a certificate for a beneficial interest owned by him in the Norumbega Town and Country Club of the face value of $5,000. Instead of the trust deed, petitioner on January 29, 1931, mailed Miss Warrington Mrs. Wright's note for $1300, which the latter had delivered to him for the former, together with certificates of beneficial interest in the same organization for the face value of $2,500, and also delivered other certificates to Mrs. Wright. Both checks of Mrs. Wright to Yoakam bore the endorsement of Yoakam, followed by that of petitioner. The latter testified that he paid out the sum for Yoakam. The fact remains that Mrs. Wright received very little interest on the note although she says she requested Mr. Padgham to collect it for her many times. Also she says she requested proper security, that is, the trust deed, on many occasions. Petitioner wrote her on June 1, 1932, saying that he was adjusting the interest by crediting Mrs. Wright with payment on account of his fees. It must be stated that Mrs. Wright believed she was lending her money on good security to a responsible person without knowledge

of the condition of the title. Another very significant fact was testified to by her. The original note of Yoakam and his wife for $3,500 was delivered to the petitioner for Miss Warrington when Mrs. Wright borrowed the $1300 from her and, when Mrs. Wright received the note back in the settlement with petitioner, the clause reciting that it was secured by a deed of trust to a certain title company had been deleted. Upon discovering many of the things which have been recited herein, Mrs. Wright employed other counsel and secured a final settlement with petitioner in which he accepted the Yoakam note for the note of $4,058.06, which she had given him in the purported settlement of December, 1932.

Testimony was introduced concerning some other transactions which, if it be true, subjects petitioner to criticism, but we have recited the important matters. It has been impossible to set forth all of the testimony, but from a careful consideration of the transcript we are satisfied that the salient features have been amply demonstrated as we have set them forth; and there is no room for the contention that the evidence is insufficient to warrant the recommendations of the Board of Governors.

The contention is advanced by petitioner that he was not adequately represented by counsel of his own choosing. We are unable to agree with him in this regard. The conduct of his attorney, so far as it appears from the record, seems to have been well calculated to serve the best interests of petitioner. If there be any complaint to be made of the defense it must fall upon petitioner. It is manifest from a reading of the record that many of his answers were designed to confuse rather than clarify, probably because to clarify would have been to confess.

There is no evidence in the record justifying the claim of petitioner that he was in ill health during the hearing before the Board of Bar Governors.

With respect to the discipline, the local committee recommended and the board adopted its recommendations as follows:

Count I of the first notice to show cause: disbarment; count II of the first notice to show cause: suspension for one year; second notice to show cause: suspension for one year; Banning ranch transaction: suspension for three years; Beaumont property transaction: suspension for one year; Hark-

ness Avenue property transaction: disbarment; and two other matters: reprimand.

We have no doubt, in view of the flagrant nature of the proceedings, that in petitioner's case we are not confronted with an isolated instance of an attorney stepping beyond the rules of professional conduct, perhaps because of the pressure of forces beyond his power to resist temporarily, but rather by a confirmed policy of endeavoring to enrich himself by artifice and device at the expense of those who reposed confidence in him. We have difficulty in finding apt words in which to properly stigmatize the conduct of one who stoops so far from the professional attitude to further his own ends that truth and veracity become strangers in his dealings with his clients. Such a one cannot be tolerated among the ranks of those whose duty it is to serve first, and whose remuneration, although essential, is a matter of secondary importance.

The order is that petitioner be disbarred from the practice of the law in all of the courts of this state, commencing 30 days from June 17, 1936.

Seawell, J., Shenk, J., Curtis, J., Langdon, J., and Waste, C. J., concurred.